# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

UNITED STATES OF AMERICA,            )
                                     )
                Plaintiff,           )
                                     )
v.                                   )            No. 3:18-CR-178-TAV-HBG
                                     )
TYWAN M. SYKES,                      )
                                     )
                Defendant.           )

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the District Court's Order of Referral [Doc. 62], to address Defendant's Motion to Suppress Facebook Messages and Cell Phone Text Messages [Doc. 47] and Motion to Suppress Contents of Search of Defendant's Cellular Telephone [Doc. 48], both filed on July 24, 2020.

The Court conducted an evidentiary hearing on Defendant's motions to suppress on August 18, 2020. Assistant United States Attorney ("AUSA") Matthew Morris appeared on behalf of the Government, while Attorney Mark Brown represented the Defendant, who was also present. At the conclusion of the testimony, the Court took the matter under advisement and allowed the parties the opportunity to file post-hearing briefs. Defendant filed a post-hearing brief on September 10, 2020 [Doc. 60], while the Government also filed a Supplement [Doc. 61] to their responses to the motions to suppress on September 10, 2020.

Accordingly, after reviewing the parties' briefs and arguments, the evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that Defendant's Motions to Suppress [Docs. 47, 48] be denied.

# I.    INTRODUCTION

Defendant first seeks [Doc. 47] to suppress all Facebook messages, as well as all text messages, between him and the alleged minor victim in this case.  Defendant asserts that the National Center for Missing and Exploited Children ("NCMEC") is a government entity and did not have a warrant to search and subsequently send to law enforcement any messages initially seized by Facebook, as well as that Facebook was acting as an agent of NCMEC.  Therefore, Defendant asserts that as the initial actions of Facebook and NCMEC were performed without a warrant, his rights under the Fourth Amendment have been violated and the messages should be suppressed.  Defendant also claims that the subsequently obtained warrant for the search of his phone, as well as the consent search of the minor victim's phone, are tainted by the initial unconstitutional search.

The Government responds [Doc. 50] that Defendant's motion should be denied because Facebook's discovery of Defendant's illicit messages was the product of a private search by the company.  The Government asserts that law enforcement's review of the CyberTips provided by NCMEC did not violate the Fourth Amendment because the messages between Defendant and the minor victim had already been reviewed by Facebook prior to its referral to NCMEC.  Additionally, the Government maintains that Facebook's screening of user data for child exploitation material is not a governmental search requiring a warrant, as Facebook's screening is not undertaken pursuant to the reporting requirement in 18 U.S.C. § 2258A; rather, it contends that Facebook voluntarily screens user content as a proactive measure to protect its own business interests.  Next, the Government alleges that NCMEC and law enforcement did not exceed the scope of the private search, and even if the Court were to find that the Fourth Amendment had

been violated by Facebook's review of the accounts at issue, the evidence should not be suppressed because law enforcement acted in good faith. The Government includes as an exhibit the declaration of Raquel Morgan, who is employed by Facebook as a Custodian of Records. [Doc. 50-1].

Next, Defendant seeks [Doc. 48] to suppress the contents of the search of his cell phone, claiming that the search was unconstitutional because law enforcement impermissibly waited for an unreasonable period of time after the seizure of his phone before obtaining a warrant. Defendant asserts that the Government cannot provide an acceptable reason for the forty-two-day delay between when law enforcement seized his phone on October 18, 2018 and when they obtained a search warrant on November 29, 2018. The Government responds [Doc. 49] that the delay between the seizure of Defendant's phone and the application for the search warrant in this case was reasonable in light of the ongoing investigation, the nature of the case, and Defendant's reduced possessory interest in his phone while in custody. Therefore, the Government maintains that law enforcement "proceeded diligently in this case and built probable cause to obtain a federal warrant to search the phone." [*Id.*].

In his post-hearing brief [Doc. 60], Defendant asserts that the Court should not rely on the declaration of Raquel Morgan for any purpose other than the authentication of documents, as the declaration "ventured into substantive matters for which Sykes was deprived of the right of cross-examination." [*Id.* at 1–2]. Defendant repeats his objection from the evidentiary hearing as to the consideration of any part of the declaration on the substance of Facebook's policies and procedures, claiming that Ms. Morgan should not be allowed to testify that Facebook has an independent business purpose, or to other company procedures, "under the hearsay and

3

authentication rules." [*Id.* at 2]. Moreover, Defendant asserts that based on the testimony presented at the motion hearing, the Government failed to demonstrate a reasonable basis for the delay between seizing Defendant's cell phone and obtaining the search warrant. The Court will subsequently address Defendant's arguments in greater detail, but Defendant asserts that the resulting actions taken by Officer Williams were unnecessary if probable cause existed to obtain a search warrant on October 16, 2018.

In its post-hearing brief [Doc. 61], the Government maintains that the Court may properly rely on the signed declaration of Raquel Morgan, as the rules of evidence are generally inapplicable at a suppression hearing. The Government asserts that the Court may rely on hearsay evidence in ruling on a motion to suppress so long as it has some probative value.

## II. TESTIMONY AT THE EVIDENTIARY HEARING

At the August 18 hearing, the Government presented the testimony of Knoxville Police Department ("KPD") Officer John Williams and introduced five exhibits.[1] Defendant presented no witnesses. The Court summarizes the witness's testimony and introduced exhibits as follows.

The Government first presented the testimony of Officer Williams, who is currently employed with the KPD Internet Crimes Against Children Task Force ("KPD-ICAC"). [Tr. 6]. Officer Williams has been employed with the KPD for approximately twenty years and has been assigned to the KPD-ICAC since December of 2012. [*Id.*]. Additionally, Officer Williams was the affiant on the affidavits for the Complaint and two search warrants at issue in this case. [*Id.*].

Officer Williams first reviewed the Affidavit in support of the application for a search

---

[1] The transcript [Doc. 59] of the August 18, 2020 evidentiary hearing was filed on September 2, 2020.

4

warrant of Defendant's cell phone, which was subsequently introduced as Exhibit 1. [Tr. 7]. The Government detailed that Exhibit 1 was an "omnibus affidavit that covers the original Complaint for the defendant's arrest, as well as a search warrant for the Facebook accounts of the defendant and the victim, and as well as the phone of the defendant." [Tr. 8]. The first paragraph of the Affidavit details Officer Williams' training and experience with respect to the type of case at issue, including that he has received training on forensic searches of computers and cell phones and how an electronic service provider ("ESP") reviews data that is stored on their server. *See* [Tr. 9].

First, Officer Williams stated that the KPD-ICAC reviewed a Priority 1 CyberTip from NCMEC on October 16, 2018. This CyberTip included information submitted by Facebook which indicated that Defendant was enticing a minor female to produce visual depictions of herself and stated that it was believed that Defendant and the minor female had previously met and engaged in sexual activity. [Tr. 9–10]. Officer Williams testified that a CyberTip is submitted by an ESP when they become aware of criminal activity, such as enticement or any crime that involves the sexual exploitation of children, and the ESP subsequently submits that information to NCMEC. [Tr. 10]. NCMEC then attempts to determine the general location of where the crime is being committed and informs the appropriate local agency. [*Id.*]. Officer Williams then testified that as a result of his training, he has learned that ESPs—like Facebook—screen for child exploitation material through reviewing "hashes" of files and photo DNA, as well as a proprietary process that is not disclosed. [Tr. 11].

The Government then introduced under seal as Exhibit 2 the CyberTip, ending in –784, received by NCMEC on October 10, 2018. [Tr. 12]. Officer Williams testified that this CyberTip was a Priority Level: E, which is the lowest level of priority and typically indicates the possession

or distribution of child exploitation images. [Tr. 13]. Officer Williams stated that this CyberTip involved three files that had been uploaded onto Facebook and were identified as apparent child pornography. [Tr. 13–14]. Additionally, Officer Williams explained that the documentation that the ESP reviewed the entire contents of the uploaded file means that before submitting the CyberTip, an individual at Facebook physically viewed the files at issue before sending them to NCMEC. [Tr. 14].

Next, the Government introduced under seal as Exhibit 3 the CyberTip, ending in –964, received by NCMEC on October 15, 2018. [Tr. 15]. Officer Williams stated that this CyberTip indicates apparent child pornography pertaining to eleven files that were found by Facebook and reported to NCMEC, and that Facebook reviewed the entire contents of these eleven uploaded files. [*Id.*].

The Government then introduced under seal as Exhibit 4 the CyberTip, ending in –406, received by NCMEC on October 16, 2018. [Tr. 16]. Officer Williams testified that this CyberTip was marked as Priority Level: 1, indicating a current or imminent risk to an individual. [*Id.*]. Officer Williams stated that this designation means that the alleged perpetrator of a crime would have immediate access to a child, and that this priority level is not a common occurrence. [Tr. 16–17]. Officer Williams detailed that this CyberTip set the investigation at issue into motion and detailed child sexual molestation as the incident type. [Tr. 17]. Additionally, Officer Williams noted that the CyberTip indicates that an analyst at Facebook reviewed all content, including conversations and images, referenced in the report. [Tr. 18].

The Government summarized the CyberTip as detailing that a forty-three year old male appeared to be enticing a fifteen-year-old female to produce and send apparent child exploitation

images, as well as that the resulting conversation indicated that they may have met to engage in sexual activity and were in close proximity to each other. [Tr. 17]. Officer Williams testified that Section A of the CyberTip—information reported by the ESP—indicates that in private messages the victim states that she was fifteen years old. [Tr. 19]. Officer Williams noted that the CyberTip includes excerpts of conversations between Defendant and the minor victim. [*Id.*].

Officer Williams stated that the excerpted conversations indicated to him that Defendant was using Facebook for the purpose of having sex with a minor victim. [Tr. 20]. Additionally, Officer Williams detailed that the minor victim sent an image reported as an apparent child exploitation image to Defendant, and that he had reviewed the images contained within the CyberTip ending in –406. [Tr. 20–21].

When describing the investigation, Officer Williams stated that on October 16, 2018, after reviewing the CyberTip ending in –406, he requested that Facebook preserve both accounts that were the subject of these CyberTips. [Tr. 22]. He then was able to identify the minor female victim and contacted the Department of Children's Services to make a referral. [*Id.*]. Officer Williams stated that he was able to identify the Defendant, that the CyberTip indicated that Defendant was a sex offender, and that law enforcement then decided to make contact first with the victim. [Tr. 22–23]. Officer Williams testified that he went to the victim's residence, spoke with her aunt who had legal custody over the minor victim, and obtained permission to speak with the victim. [Tr. 23–24]. Officer Williams stated that he asked the victim's aunt to take custody of the victim's phone before they arrived in order to preserve the data on the phone. [Tr. 24].

Officer Williams then detailed the initial interview with the minor victim. [Tr. 25]. Officer Williams stated that the victim originally denied knowing anyone with Defendant's name; at which

7

point he showed the victim an image of herself, and she stated that she had been in communication with and had sex with Defendant. [*Id.*]. Moreover, Officer Williams testified that the victim stated that she had taken images of a sexual nature of herself at Defendant's request. [Tr. 25–26]. At this time, law enforcement also identified the victim's AOL email account and sent a preservation request. [Tr. 26].

Officer Williams testified that on October 17, 2018, he contacted AUSA Morris to provide him with the details of the case to see if it could be accepted as a federal prosecution and began preparing a federal arrest warrant for Defendant. [*Id.*]. After the Complaint was signed, law enforcement began looking to locate Defendant on the following day, and Defendant was arrested by the United States Marshals Service on October 18, 2018. [Tr. 26–27]. Officer Williams stated that he asked the Marshals Service if Defendant was willing to be interviewed by him, and they stated that Defendant indicated that he would. [Tr. 27]. Upon Defendant's arrest, he was transported to the Blount County Detention Center, and his phone was taken to be placed in his property upon his arrest at the facility. [*Id.*]. Officer Williams stated that he arrived at the Blount County Detention Center to interview Defendant with his partner, that Defendant originally stated that he had not sent any messages to the victim, as well as that while he had several Facebook friends with the victim's name, he did not know her. [Tr. 29–30]. After the interview, Officer Williams requested to obtain the Defendant's phone for evidence. [Tr. 30]. Officer Williams testified that he knew that detainees are not allowed to have a cell phone in the Blount County Detention Center, and he then obtained possession of Defendant's LG cell phone. [Tr. 28].

After obtaining Defendant's phone, Officer Williams completed out a KPD property inventory report form, left the receipt to be placed in Defendant's property at the Blount County

8

Detention Center, and placed the phone in a Faraday box at the KPD-ICAC office in order to ensure the preservation of data on the phone. [Tr. 30–31]. Officer Williams testified that this box eliminates any data coming in or going out of the device. [Tr. 31]. Additionally, Officer Williams stated that he arrived back at the KPD-ICAC office at approximately 8:30 or 9:00 p.m. [Tr. 32].

Officer Williams stated that the next step in the investigation was interviewing the victim's aunt's minor daughter—or the victim's cousin—on October 22, 2018, who was also living with the victim and the victim's aunt. [*Id.*]. Here, Officer Williams testified that he interviewed the victim's cousin because the victim was not very forthcoming originally and stated that she did want to put Defendant in jail. [Tr. 33]. Therefore, Officer Williams stated that he hoped the interview with the victim's cousin would provide a more accurate representation of how the victim knew Defendant. [*Id.*]. Officer Williams also testified that he prepared a request to Defendant's cell phone provider to preserve the cell tower activity, call logs, and other data that would be kept on record. [Tr. 32].

On October 23, 2018, Officer Williams coordinated with the Department of Children's Services to conduct a second interview of the victim and began to examine the victim's phone that law enforcement was given the consent to search. [Tr. 33]. Officer Williams testified that he began preparing the search warrants for the victim and Defendant's Facebook accounts on October 24, 2018 [Tr. 33–34], and that he began preparing a warrant for the cell tower information from Defendant's cell phone on October 26, 2018 [Tr. 34].

Next, Officer Williams detailed that on October 30, 2018, he sent subpoenas to T-Mobile and Charter for subscriber information. [*Id.*]. Officer Williams stated that he requested assistance from an agent with the Department of Homeland Security to obtain the subpoena for cell tower

9

information, and that the subpoena was sent to New Orleans to be approved. [Tr. 34–35]. After approval, Officer Williams testified that the subpoena is then submitted to the cell phone provider. [Tr. 35].

Officer Williams stated that the federal magistrate judge signed the Facebook search warrant on November 1, 2018, and that he received the return from Facebook with the data that was ordered to be produced on November 5, 2018. [*Id.*]. Officer Williams testified that he began the time-consuming process of examining the information returned from Facebook, which consisted of a PDF that included all communications; as well as folders that contained other account information, such as the media and friends list. [Tr. 35–36]. Officer Williams detailed that the provided Facebook messages included over 3,400 total pages of communications for all users on Defendant's account. [Tr. 36–37]. Officer Williams later stated that approximately 680 pages of Facebook messages were produced from the victim's account. [Tr. 38].

Additionally, Officer Williams testified that the provided messages were not segregated by any particular users, although he was able to search within the messages. [Tr. 37]. However, Officer Williams stated that he also reviewed the messages to find out if Defendant had been communicating with any other minor children, and that this required verifying the age of certain individuals Defendant had been communicating with. [Tr. 37–38]. Officer Williams testified that as of November 5, 2018, he located messages between Defendant and other minor females where it appeared that Defendant was possibly attempting to entice these other potential victims. [Tr. 38]. Officer Williams stated that on November 6, 2018, he presented to the federal grand jury and Defendant was subsequently indicted. [Tr. 39]. He testified that he worked with AUSA Morris and other members of the U.S. Attorney's Office to prepare the discovery that is provided to

10

defense counsel after an individual is indicted and has appeared before the Court. [*Id.*].

Additionally, Officer Williams stated that on November 7–9, 2018, he was in Gatlinburg for mandatory all-day training program for the KPD-ICAC unit, but that he started preparing a federal search warrant for Defendant's LG phone on November 12, 2018. [Tr. 40]. When describing the affidavit, Officer Williams testified that he included information gathered from the CyberTips, the Facebook search warrants of Defendant and the victim's phones, and the results of the investigation in order to establish probable cause. [Tr. 41].

On November 14, 2018, a "CPIT" hearing was held in order to put a plan in place through an order of protection or restraining order to prevent Defendant from communicating with the two other minor females, as Defendant was making calls to at least one of the minor females after he was in custody. [Tr. 42]. Officer Williams testified that he provided this information to the Department of Children's Services, who determined that there was a need to prevent Defendant from communicating with these minor females. [Tr. 42–43]. Officer Williams then detailed that he assisted the Department of Homeland Security with the execution of a search warrant for an unrelated case in New Tazewell on November 15, 2020. [Tr. 41–43].

Discovery was provided for Defendant on November 16, 2018, and Officer Williams stated that he interviewed Defendant's ex-girlfriend on November 19, 2018. [Tr. 44]. Officer Williams testified that this interview occurred because Defendant had stated that he did not know the victim, and he believed that his ex-girlfriend had hacked his Facebook account. [*Id.*]. Then, according to Officer Williams, on November 21, 2018, he was present when forensic interviews were completed of the two other minor females by the Department of Children's Services in Blount County. [Tr. 44–45]. By November 27, 2018, Officer Williams had completed the affidavit for

the search warrant of Defendant's phone, sent it to AUSA Morris, and the search warrant was signed on November 29, 2018.  [Tr. 45].

With respect to Defendant's phone, Officer Williams testified that he confirmed that detainees are not permitted to have their phones inside of the Blount County Detention Center, as well as that he was not aware of Defendant asking for his phone to be returned to him or anyone else during the pendency of this case.  [Tr. 45–47].  The Government then introduced as Exhibit 5 the declaration of Raquel Morgan relating to Facebook's purposes for screening its material for child exploitation matter, although Defendant objected to this declaration being used for testimony regarding the usual business practices of Facebook.  [Tr. 47–49].  The Court detailed that this exhibit would be marked for identification purposes only at that time, and that it would subsequently determine the extent to which it would rely upon Exhibit 5.  [Tr. 49].

On cross-examination, Officer Williams reviewed Exhibit 2, the CyberTip ending in –784, and stated that he did not open the investigation on October 10, 2018 (the date of receipt by NCMEC), despite it including images of supposed child pornography.  [Tr. 51–52].  Additionally, with respect to Exhibit 3, the CyberTip ending in –964, Officer Williams testified that this CyberTip was also priority level E, and he did not open the investigation on October 15, 2018, despite it including images of apparent child pornography.  [Tr. 52–53].  Officer Williams stated that he had not received either of these CyberTips until October 16, 2018, and that he received all three CyberTips on October 16, 2018.  [Tr. 53].

Additionally, Officer Williams testified that CyberTips are submitted when an ESP provides information to NCMEC, who then forwards the report to a local agency.  [Tr. 53–54].  Officer Williams stated that the ESP, such as Facebook, does not determine which local agency

the information is sent to, as they provide identifiers or information in the CyberTip which are then used by NCMEC to identify the persons involved and location. [Tr. 54–55]. Officer Williams testified that internet service providers are required by federal statute to report certain information to NCMEC. [Tr. 55].

When discussing the CyberTip received on October 16, 2018, specifically the section entitled "Additional information provided by NCMEC," Officer Williams testified that this section is "information, such as IP addresses, names, birth dates . . . that come from the electronic service provider," and that if NCMEC "see[s] an IP address, they will attempt to GEOLocate that IP address so they know who best to send it to" or identify a person through a provided name and date of birth. [Tr. 56]. Officer Williams stated that NCMEC tries to assist law enforcement by preventing them from having to gather this information. [Tr. 56–57].

When discussing his contact with the victim's aunt, Officer Williams stated that she informed him that she was the victim's legal guardian, but that he did not see any supporting documentation. [Tr. 57]. Additionally, Officer Williams testified that he interviewed the victim's cousin because the victim was not very forthcoming in her first interview, despite also stating that she had met with Defendant and that they had sex. [Tr. 58].

Officer Williams detailed that he started examining the victim's phone on October 23, 2018. [*Id.*] Officer Williams confirmed that he was given consent to search the victim's phone on October 16, 2018, and while it was possible he may have looked at the phone on that day, he did not begin the physical extraction of the device which places all of the data in a readable format. [Tr. 58–59]. In response to defense counsel's questioning, Officer Williams stated that it was possible that he told Defendant that he knew that Defendant had communicated with the victim

because he had looked at her phone during his interview with Defendant on October 18, 2020. [Tr. 59].

Additionally, Officer Williams confirmed that Defendant's phone was in the Faraday box in the KPD-ICAC office from October 18, 2020 until November 29, 2020. [Tr. 60]. However, he testified that he could not recall whether any information from the Department of Children's Services interviews with the two minor females, or his interview with Defendant's ex-girlfriend, was included in his affidavit in support of the application for a search warrant. [Tr. 61–62]. Officer Williams stated that he did not know whether Defendant had ever sought a restraining order against his ex-girlfriend. [Tr. 62]. Officer Williams was then questioned regarding whether when he took possession of the victim's phone, he believed that he had probable cause to obtain a search warrant for Defendant's phone. [Tr. 64]. Officer Williams testified that "I'm not saying that I did not have probable cause to get a search warrant for [Defendant's] phone." [*Id.*].

On re-direct examination, Officer Williams stated that the CyberTips, in particular Exhibit 4, contain an IP address and that an ESP receives the IP address of users that are accessing their servers. [Tr. 65–66]. Additionally, Officer Williams testified that the NCMEC can look at publicly available information and determine which provider had a certain IP address. [Tr. 66]. Therefore, Officer Williams stated that when NCMEC provided information to assist law enforcement, it was providing information that was publicly available. [*Id.*]. Officer Williams also testified that based upon knowledge obtained in his training and experience, ESPs screen content for child exploitation material to provide a safe platform for their users and to prevent their services from being used for illegal purposes. [Tr. 67]. On re-cross examination, Officer Williams stated that IP addresses are publicly available to those who have provided a service, such as

14

Facebook, or if software was used to connect to another individual. [Tr. 68].

## III. DEFENDANT'S FIRST MOTION TO SUPPRESS

Defendant moves [Doc. 47] to suppress the seized Facebook messages and text messages from his phone, alleging that NCMEC is a governmental entity, as federal statutes mandate its reporting to law enforcement authorities. Additionally, Defendant asserts that he had a reasonable expectation of privacy in his Facebook messages and text messages on his cell phone, and that his messages were improperly "seized and forwarded to a [g]overnment entity [NCMEC] by Facebook operating as an agent of that [g]overnment entity" without a warrant. [*Id.* at 4].

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. A "search" occurs when the government infringes on an expectation of privacy that society is prepared to consider reasonable, *see United States v. Jacobsen*, 466 U.S. 109, 115 (1984), or where the government physically intrudes on a constitutionally protected area for the purpose of obtaining information, *see United States v. Jones*, 565 U.S. 400, 407–08 (2012). However, the Fourth Amendment "proscrib[es] only governmental action; it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *Jacobsen*, 466 U.S. at 113 (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)). "[A] private party's search is attributable to the government only 'if the private party acted as an instrument or agent of the Government.'" *United States v. Shepherd*, 646 F. App'x 385, 388 (6th Cir. 2016) (quoting *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 614 (1989)).

15

## A.  NCMEC's Status as a Government Actor

Defendant largely bases his argument on the finding of the Tenth Circuit Court of Appeals in *United States v. Ackerman* that NCMEC is a government agent because it was "endowed with law enforcement powers beyond those enjoyed by private citizens."  831 F.3d 1292, 1296 (10th Cir. 2016) (Gorsuch, J.).  In *Ackerman*, AOL conducted a hash search of the defendant's email account, and logged hash values for images that were previously determined to be child pornography.  *Id.* at 1294.[2]  "AOL's email filter identified one image out of four attachments to an email that matched the hash value of an image AOL had previously deemed to be child pornography."  *United States v. Miller*, No. CV 16-47-DLB-CJS, 2017 WL 2705963, at *6 (E.D. Ky. June 23, 2017) (citing *Ackerman*, 831 F.3d at 1294).  However, "NCMEC opened an email and three previously unopened attachments to confirm that the files contained images of apparent child pornography."  *United States v. Kendall*, No. CR 18-19-DLB-EBA, 2019 WL 5782010, at *3 (E.D. Ky. Nov. 6, 2019) (citing *Ackerman*, 831 F.3d at 1306).

"The Sixth Circuit has not yet determined whether NCMEC itself is a government agent." *Miller*, 2017 WL 2705963 at *3.[3]   However, "[i]n light of *Ackerman*, and because this case can

---

[2] "In *Ackerman*, the court explained hash values as 'a short string of characters generated from a much larger string of data (say, an electronic image) using an algorithm–and calculated in a way that makes it highly unlikely another set of data will produce the same value. Some consider a hash value as a sort of digital fingerprint.'"  *United States v. Kendall*, No. 0:18-CR-19-DLB, 2019 WL 7593893, at *3 (E.D. Ky. Aug. 30, 2019) (quoting *Ackerman*, 831 F.3d at 1294), *report and recommendation adopted by*, 2019 WL 5782010 (E.D. Ky. Nov. 6, 2019).

[3] The Tenth Circuit in *Ackerman* noted that 18 U.S.C. § 2258A and 42 U.S.C. § 5773(b) require NCMEC's collaboration with law enforcement authorities and explained that "NCMEC's statutory duties are to: (1) maintain an electronic tipline for ISPs to report possible internet child exploitation violations to the government; (2) ISPs must report any known child pornography violations to NCMEC; (3) when NCMEC has confirmed that it has received a report that ISP must treat that confirmation as a request to preserve evidence issued by the government itself and (4)

16

be more easily decided on other grounds, this Court assumes, without deciding, that NCMEC is a state actor." *See United States v. Crawford*, No. 3:18 CR 435, 2019 WL 3207854, at *3 (N.D. Ohio July 16, 2019); *see, e.g.*, *Miller*, 2017 WL 2705963 at *3 ("Magistrate Judge Smith assumed without deciding that NCMEC acted as a government agent in this case . . . and the Court sees no reason to disturb that assumption. However, that assumption does not extend to ESPs (like Google) that voluntarily scan emails for child pornography and report apparent child pornography to NCMEC.").

### B. Facebook Did Not Serve as an Agent of a Government Actor

Defendant contends that as Facebook is statutorily required to provide information to NCMEC, it is therefore an agent of a governmental actor. Therefore, Defendant claims that NCMEC is "subject to the requirements of the Fourth [ ] Amendment and cannot open any communications from Facebook or forward information from Facebook to local law enforcement without first obtaining a search warrant or demonstrating an exception to the warrant requirement." [Doc. 47 at 10]. The Government contends that even assuming "that NCMEC was a government actor, as defendant argues, Facebook's prior private search vitiates the defendant's Fourth Amendment argument regarding NCMEC's relationship with the government." [Doc. 50 at 6].

The Sixth Circuit uses a two-part test to determine whether a private entity is a government

---

NCMEC is statutorily authorized to received contraband knowingly and review its contents . . . action that would normally subject private persons to criminal prosecution." *See Kendall*, 2019 WL 7593893 at *1 (citing *Ackerman*, 831 F.3d at 1296); *see, e.g.*, *United States v. Lacey*, No. CR-18-00422-001-PHX-SMB, 2020 WL 3488615, at *7 (D. Ariz. June 26, 2020) ("The *Ackerman* court recognized that NCMEC's authorizing statutes mandated collaboration with all levels of law enforcement and granted the organization law enforcement powers that extended far beyond those enjoyed by primary citizens, to conclude that, in the Fourth Amendment context, NCMEC is a governmental entity, and, at minimum, served as a government agent in that case.").

17

agent for the purposes of the Fourth Amendment. "In the context of a search, the defendant must demonstrate two facts: (1) [l]aw enforcement 'instigated, encouraged or participated in the search' and (2) the individual 'engaged in the search with the intent of assisting the police in their investigative efforts.'" *United States v. Hardin*, 539 F.3d 404, 419 (6th Cir. 2008) (quoting *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985)); *see, e.g.*, *United States v. Shepherd*, 646 F. App'x 385, 388 (6th Cir. 2016).

Defendant contends that Facebook's mandatory reporting requirement results in the private company being an agent of NCMEC. The Stored Communications Act permits remote computing services to disclose records, information, and contents of accounts only "as may be necessary incident to the rendition of the service or to protect the rights or property of the provider of that service;" to NCMEC, in connection with a report submitted under section 2258A; or "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency." 18 U.S.C. § 2702(b)(5), (6), (8).

Facebook is required by law to report apparent child pornography to NCMEC through the CyberTipline when it becomes aware of it under 18 U.S.C. § 2258A. 18 U.S.C. § 2258A provides in part:

a) Duty to report.—

(1) In general.--Whoever, while engaged in providing an electronic communication service or a remote computing service to the public through a facility or means of interstate or foreign commerce, obtains actual knowledge of any facts or circumstances described in paragraph (2) shall, as soon as reasonably possible–

(A) provide to the CyberTipline of the National Center for Missing and Exploited Children, or any successor to the CyberTipline operated by such center, the mailing address, telephone number,

facsimile number, electronic mail address of, and individual point of contact for, such electronic communication service provider or remote computing service provider; and

(B) make a report of such facts or circumstances to the CyberTipline, or any successor to the CyberTipline operated by such center.

(2) Facts or circumstances.--The facts or circumstances described in this paragraph are any facts or circumstances from which there is an apparent violation of--

(A) section 2251, 2251A, 2252, 2252A, 2252B, or 2260 that involves child pornography; or . . .

(b) Contents of report.--To the extent the information is within the custody or control of an electronic communication service provider or a remote computing service provider, the facts and circumstances included in each report under subsection (a)(1) may include the following information:

(1) Information about the involved individual.--Information relating to the identity of any individual who appears to have violated a Federal law described in subsection (a)(2), which may, to the extent reasonably practicable, include the electronic mail address, Internet Protocol address, uniform resource locator, or any other identifying information, including self-reported identifying information.

First, the Court notes that the "statute does not require providers to search for child pornography;" in fact, it "requires only that a provider report to NCMEC if it discovers apparent child pornography on its platform." *United States v. Crawford*, No. 3:18-CR-435, 2019 WL 3207854, at *4 (N.D. Ohio July 16, 2019). The statute specifically states that "[n]othing in this section shall be construed to require a provider to– (1) monitor any user, subscriber, or customer of that provider; (2) monitor the content of any communication of any [user, subscriber, or customer]; or (3) affirmatively search, screen, or scan for facts or circumstances" related to online child exploitation. 18 U.S.C. § 2258A(f).

"[T]he Sixth Circuit has not yet addressed the issue of whether ESPs . . . act as an agent of the government when they scan files on their network for child pornography and, pursuant to the reporting requirement contained in 18 U.S.C. § 2258A, report findings of apparent child pornography to NCMEC." *United States v. Miller*, No. CR 16-47-ART-CJS, 2017 WL 9325815, at *3 (E.D. Ky. May 19, 2017), *report and recommendation adopted by*, 2017 WL 2705963 (E.D. Ky. June 23, 2017). "However, the cases that have considered the issue have uniformly held that such conduct does not transform an ESP into a government actor." *Id.* (collecting cases); *see United States v. Stevenson*, 727 F.3d 826, 830 (8th Cir. 2013) ("A reporting requirement, standing alone, does not transform an Internet service provider into a government agent whenever it chooses to scan files sent on its network for child pornography."); *United States v. Cameron*, 699 F.3d 621, 638 (1st Cir. 2012) ("[T]he statute did not impose any obligation to *search* for child pornography, merely an obligation to *report* child pornography of which Yahoo! became aware."); *United States v. Richardson*, 607 F.3d 357, 367 (4th Cir. 2010) ("We conclude that the statutory provision pursuant to which AOL reported Richardson's activities did not effectively convert AOL into an agent of the Government for Fourth Amendment purposes.").

Here, Defendant acknowledges the recent opinion of the Eastern District of Kentucky in *United States v. Miller*, where the Court rejected the defendant's argument that Google was acting as an agent of a government actor when it forwarded images of child pornography to NCMEC through a CyberTip. *See Miller*, 2017 WL 2705963 at *1. Defendant maintains that "[i]t is at best persuasive authority from a fellow district court," and that if the search of an ESP is to be "entirely independent . . . of the government's desire to collect evidence, the statute cannot direct [E]SPs like Facebook and others to report such discoveries." [Doc. 47 at 12].

20

While Defendant relies on the mandatory reporting required under 18 U.S.C. § 2258A, he fails to cite to any supporting case law finding that such requirements transform an ESP into an agent of a governmental actor. Additionally, Defendant fails to assert that the factual circumstances of the pending motion to suppress are distinct from those addressed by the Eastern District of Kentucky in *Miller*. In *Miller*, an ESP (Google) used it's "product abuse detection system" and proprietary hashing technology to detect apparent child pornography sent in an email, and subsequently reported the user to NCMEC. *See Miller*, 2017 WL 2705963 at *1

The Court also finds that "[t]he statutory reporting requirements are not sufficient to transform [Facebook] into a government agent . . . ." *Id.* at *3. Unlike the regulatory scheme considered by the Supreme Court in *Skinner v. Railway Labor Executives' Association*, the actions taken by Facebook were the result of "private initiative." 489 U.S. 602, 616 (1989). In *Skinner*, the Supreme Court reviewed whether the Federal Railroad Administration's regulation governing drug testing of private railroad company employees implicated the Fourth Amendment. *Id.* The *Skinner* Court noted that the regulations mandated the means, method, and procedures for testing, and concluded that "[a] railroad that complied with the provision of Subpart C of the regulations does so by compulsion of sovereign authority, and the lawfulness of its acts is controlled by the Fourth Amendment." *Id.* at 614.

Ultimately, the Court agrees with the Eastern District of Kentucky that "[u]nlike the regulations at issue in *Skinner*, the statutory scheme for reporting child pornography does not purport to authorize or remove 'legal barriers' to ESP email scanning, or 'prescribe consequences for [an ESP's] users should they refuse to submit' to the scanning." *See Miller*, 2017 WL 2705963 at *3 (quoting *United States v. Stevenson*, 727 F.3d 826, 829–30 (8th Cir. 2013)). First, the statute

21

explicitly disclaims a monitoring requirement under 18 U.S.C. § 2258A(f), and the mandatory reporting requirements apply only to apparent images of child pornography that ESPs are aware of under 18 U.S.C. § 2258A(a). Further, the penalties for failing to report apparent child pornography do not compel ESPs to monitor for such images, as ESPs "might just as well take steps to avoid discovering reportable information." *See United States v. Richardson*, 607 F.3d 357, 367 (4th Cir. 2010); *see also United States v. Ringland*, 966 F.3d 731, 736 (8th Cir. 2020) ("Moreover, the statutory scheme does not so strongly encourage affirmative searches such that it is coercive. In fact, the penalties for failing to report child pornography may even discourage searches in favor of willful ignorance.").

If "the intent of the private party conducting the search is entirely independent of the government's intent to collect evidence for use in a criminal prosecution," then "the private party is not an agent of the government." *United States v. Hardin*, 539 F.3d 404, 418 (6th Cir. 2008) (internal citation and quotation marks omitted). Here, the Government introduced the declaration of Raquel Morgan, who is currently employed as a custodian of records for Facebook, Inc. *See* [Doc. 50-1].[4] Ms. Morgan's declaration states that Facebook has an independent business purpose

---

[4] During the suppression hearing, as well as in his post-hearing brief, Defendant objected to the introduction of Ms. Morgan's declaration for any purpose other than authenticating records, such as the attached exhibits to the declaration—Facebook's Community Standards Regarding Child Nudity and Sexual Exploitation of Children (Exhibit A); Facebook's Data Policy (Exhibit B); and information Facebook provides about its use of proprietary technology to combat inappropriate interaction with children (Exhibit C). Defendant asserts that allowing Ms. Morgan to testify about Facebook's independent business purposes violates his rights under the Confrontation Clause. The Government responds that the rules of evidence are generally inapplicable at a suppression hearing, and the Court may rely upon such hearsay evidence so long as it has some probative value.

"At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz*, 447 U.S. 667, 679

22

in keeping its platform safe and free from harmful content and conduct, including such that sexually exploits children. [*Id.* at ¶ 3]. Additionally, the declaration states that a Facebook employee reviewed the entire contents of the reported communications at issue before they were submitted to NCMEC, and that Facebook's identification of the accounts and communications at issue was conducted in furtherance of its independent business purpose of keeping its platform and users safe. [*Id.* at ¶¶ 7–9]. Moreover, Ms. Morgan's declaration states that Facebook's review of the content contained in the CyberTips, as well as the submission of the CyberTips to NCMEC, was not conducted at law enforcement's request. [*Id.* at ¶ 9].

Defendant has not presented evidence that NCMEC or law enforcement "instigated, encouraged or participated in the search" of Defendant's Facebook messages. *See Hardin*, 539 F.3d at 419 (quoting *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985)). Rather, Ms.

---

(1980). The Court may rely on such hearsay evidence so long as it is "credible and competent." *United States v. Kellog*, 202 F. App'x 96, 106 (6th Cir. 2006) (Griffin, J. concurring in part and dissenting in part); *see, e.g.*, *United States v. Killebrew*, 594 F.2d 1103, 1105 (6th Cir. 1979); *United States v. Manning*, No. CR 17-20469, 2018 WL 3134566, at *3 (E.D. Mich. June 27, 2018). "[T]he right of confrontation does not apply to the same extent at pretrial suppression hearings as it does at trial. 'The interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself.'" *United States v. Boyce,* 797 F.2d 691, 693 (8th Cir. 1986) (*quoting United States v. Raddatz,* 447 U.S. 667, 679 (1980)); *see, e.g.*, *United States v. Garcia*, 324 F. App'x 705, 708 (10th Cir. 2009) ("There is no binding precedent from the Supreme Court or this court concerning whether *Crawford* applies to pretrial suppression hearings. To the extent that we can divine clues from our case law concerning the resolution of this issue, they do not benefit Mr. Garcia.").

Ultimately, the Court finds Ms. Morgan's declaration to be credible and competent, and the Court will consider this out-of-court statement in resolving Defendant's motion to suppress. Moreover, the Court notes the consideration of a similar affidavit in at least one opinion addressing a comparable motion to suppress. *See United States v. Crawford*, No. 3:18-CR-435, 2019 WL 3207854, at *4 (N.D. Ohio July 16, 2019) (citing to the affidavit of "Google's Senior Manager of Law Enforcement and Information Security" when addressing Google's business interest in clearing their platforms of abusive material).

23

Morgan's declaration explicitly states that the review of the communications at issue was not conducted at the request of law enforcement or NCMEC. Additionally, as considered by the Eastern District of Kentucky in *Miller*, Defendant has failed to "present evidence to suggest that NCMEC or law enforcement were aware of the existence of Defendant" or the Facebook account at issue prior to Facebook's review in this case. *United States v. Miller*, No. CR 16-47-ART-CJS, 2017 WL 9325815, at *5 (E.D. Ky. May 19, 2017), *report and recommendation adopted by*, 2017 WL 2705963 (E.D. Ky. June 23, 2017); *see United States v. Cameron*, 699 F.3d 621, 638 (1st Cir. 2012) (finding no evidence that the government instigated the search, participated in the search, or coerced the ESP to conduct the search at issue); *United States v. Crawford*, No. 3:18 CR 435, 2019 WL 3207854, at *4 (N.D. Ohio July 16, 2019) ("No evidence suggests NCMEC knew Crawford's accounts existed until after Google and Synchronoss had already searched them. And in those instances where a provider sent several CyberTips on the same account, there is no indication NCMEC encouraged or assisted in the later searches after receiving the initial CyberTip.").

Additionally, Defendant has not shown that Facebook "engaged in the search with the intent of assisting the [government] in their investigative efforts." *Hardin*, 539 F.3d at 419 (quoting *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985)). Ultimately, the Court does not find that compliance with their statutory duty converts Facebook into a government actor when it "investigated the use of its business platform as a private actor in furtherance of its business interest in excluding users of its service perpetrating child abuse and child exploitation." *See United States v. Rosenow*, No. 17-CR-3430-WQH, 2018 WL 6064949, at *9 (S.D. Cal. Nov. 20, 2018). Facebook's "business interest in clearing their platforms of abusive material is independent of the government's interest in investigation and prosecution." *Crawford*, 2019 WL 3207854 at

*5. Facebook has an independent business interest in enforcing its terms of service and ensuring that its product is free of illegal conduct such as apparent child pornography. *See United States v. Ringland*, 966 F.3d 731, 736 (8th Cir. 2020) ("Here, Google did not act as a government agent because it scanned its users' emails volitionally and out of its own private business interests. Google did not become a government agent merely because it had a mutual interest in eradicating child pornography from its platform."); *United States v. Miller*, No. CV 16-47-DLB-CJS, 2017 WL 2705963, at *4 (E.D. Ky. June 23, 2017) ("Even without a statutory obligation to report its findings to NCMEC, it seems likely that Google would screen its platform for images of child pornography because doing so is good business practice.").

Accordingly, the Court finds that neither prong of the *Lambert* test is met in the present case, and that Facebook was not an agent of a governmental entity. The Government did not instigate or encourage the search of Defendant's Facebook account, and Facebook did not search Defendant's account with the intent of assisting the Government.

## C. Private Search Doctrine

Ultimately, the Court also finds that Officer Williams' and NCMEC's actions in viewing the CyberTips did not implicate the Fourth Amendment because they did not exceed the scope of the prior, private search conducted by Facebook.

In *United States v. Jacobsen*, the Supreme Court found that the Fourth Amendment does not apply to a private search, and held that where "a governmental search . . . follows on the heels of a private one . . . [t]he additional invasions of [a person's] privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search." *United States v. Jacobsen*, 466 U.S. 109, 115 (1984). "[T]he Government may not exceed the scope of

the private search unless it has the right to make an independent search." *Id.* at 116. "Under the private search doctrine, the critical measures of whether a governmental search exceeds the scope of the private search that preceded it are how much information the government stands to gain when it re-examines the evidence and, relatedly, how certain it is regarding what it will find." *United States v. Lichtenberger*, 786 F.3d 478, 485–86 (6th Cir. 2015) (citing *Jacobsen*, 466 U.S. at 119–20).

In his motion to suppress, Defendant argues that it is unclear "whether the subsequent search by [KPD]-ICAC after the Cyber Tipline report from NCMEC was the same search as that of NCMEC, or if it exceeded that search," or if "NCMEC's subsequent search exceeded Facebook's initial search." [Doc. 47 at 13]. Moreover, Defendant claims that "[t]he Court must therefore determine if the [KPD]-ICAC learned anything more than the NCMEC, and more critically if the NCMEC learned more than Facebook." [*Id.* at 14]. However, in his post-hearing brief, Defendant does not address the private search doctrine, or point to any elicited testimony from Officer Williams which allegedly demonstrates that law enforcement exceeded the scope of Facebook's initial search.

In *United States v. Ackerman*, the Tenth Circuit found that NCMEC expanded upon the private search conducted by AOL because in addition to opening the attachment searched by AOL's automated filter for hash value, NCMEC also opened an email and three attachments that AOL had not previously opened or filtered. 831 F.3d 1292, 1305–06 (10th Cir. 2016). Here, Defendant has failed to argue that Officer Williams or NCMEC exceeded the scope of the prior search conducted by Facebook. Moreover, Defendant has not demonstrated that the facts are analogous to those considered by the Tenth Circuit in *Ackerman*. Ms. Morgan's declaration sets

forth that Facebook reviewed the entire file sent to NCMEC, and the evidence before the Court does not establish that Officer Williams, or NCMEC, reviewed additional files not searched by Facebook. *See United States v. Ringland*, 966 F.3d 731, 737 (8th Cir. 2020) ("Because Investigator Alberico searched only the same files that Google searched, the government did not expand the search beyond Google's private party search."); *United States v. Miller*, No. CR 16-47-ART-CJS, 2017 WL 9325815, at *8 (E.D. Ky. May 19, 2017) ("The facts of this case are distinguishable from *Ackerman*. Most significantly, there is no evidence or allegation that Google sent anything to NCMEC other than the files of the two images having a hash value match to two images Google's employees had previously identified as being apparent child pornography."), *report and recommendation adopted by*, 2017 WL 2705963 (E.D. Ky. June 23, 2017).

Officer Williams' testimony establishes that NCMEC used the IP address and names of the individuals in the CyberTip to locate the appropriate law enforcement agency. *See* [Tr. 56–57]. However, the Court finds that this information does not exceed the scope of the private search conducted by Facebook, as Officer Williams testified that this information, including IP addresses, names, and birth dates, are provided by the ESP.[5] [Tr. 56]. *See United States v. Kendall*, No. 0:18-CR-19-DLB, 2019 WL 7593893, at *3 (E.D. Ky. Aug. 30, 2019) ("In the present case, NCMEC did not open or view the reported image of child pornography, but merely [ ] queried the

---

[5] Additionally, in *Ackerman*, the Tenth Circuit noted that it did not need to decide whether NCMEC acts as a government agent when it only opened a file that an ESP identified solely by an automated filter for hash values. 831 F.3d at 1306. Despite the fact that the entire record was reviewed by a Facebook employee prior to being provided to NCMEC in this case, the Court also finds that "[t]he digital fingerprints created by the hashing technology made it a 'virtual certainty' that when [law enforcement] viewed the . . . file, all he would see was the image [Facebook] previously identified as apparent child pornography." *See United States v. Kendall*, No. CR 18-19-DLB-EBA, 2019 WL 5782010, at *4 (E.D. Ky. Nov. 6, 2019).

IP address provided by the Cyber Tip and determined that the IP address was located in Greenup, Kentucky, before forwarding the tip to the appropriate Kentucky law enforcement authorities."), *report and recommendation adopted by*, 2019 WL 5782010 (E.D. Ky. Nov. 6, 2019).

Accordingly, the Court finds that Defendant has not established that NCMEC or law enforcement exceeded the search of the private search initially performed by Facebook. Therefore, the Court also finds that the warrant for Defendant's phone is not tainted by any initial unconstitutional search, as well as that the messages obtained from the minor victim's cell phone are also not tainted.

## IV.  DEFENDANT'S SECOND MOTION TO SUPPRESS

Defendant asserts [Doc. 48] that the evidence derived from the search of his cell phone should be suppressed because the forty-two-day delay in obtaining a warrant was unreasonable under the Fourth Amendment. Defendant notes that he was arrested on October 18, 2018, but that law enforcement subsequently failed to obtain a warrant to search his cell phone until November 29, 2018. The Government responds [Doc. 49] that the delay was reasonable in this case because of the ongoing investigation, the nature of the case, and Defendant's reduced possessory interest in his phone while in custody.

In his post-hearing brief [Doc. 60], Defendant maintains that the testimony presented at the evidentiary hearing did not establish a reasonable basis for the delay. Defendant asserts that although Officer Williams detailed the steps in the investigation from October 18, 2018 until November 29, 2018, these measures were unnecessary as Officer Williams admitted that they were not necessary to establish probable cause.

"[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment

28

because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on unreasonable seizures." *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) (internal quotation marks omitted), *cited in United States v. Saddler*, 498 F. App'x 524, 530 (6th Cir. 2012). "[E]ven with the existence of probable cause to effect a seizure, the duration of the seizure pending the issuance of a search warrant must still be reasonable." *United States v. Respress*, 9 F.3d 483, 488 (6th Cir. 1993) (citing *United States v. Saperstein*, 723 F.2d 1221 (6th Cir. 1983)). However, the Sixth Circuit has approved "[t]he practice of seizing an item based on probable cause in order to secure a search warrant." *Id.* at 486. Additionally, the Supreme Court recently addressed the search of a cell phone incident to a lawful arrest in *Riley v. California*, holding that a warrant is generally required before the search of the information contained on a cell phone, "even when a cell phone is seized incident to arrest." 573 U.S. 373, 401 (2014). While not directly addressed by the Sixth Circuit, the Court will review factors considered by other circuits to analyze the reasonableness in the delay in obtaining a search warrant.

First, the Court notes that Defendant had only a minimal possessory interest in his cell phone during the forty-two-day period at issue, as he was in custody for the entire time between the seizure of his phone and the obtaining of the search warrant. In *Segura v. United States*, 468 U.S. 796 (1984), the Supreme Court explained that the "actual interference with [the defendants'] possessory interests in the apartment and its contents was . . . virtually nonexistent" when they were in custody the entire period of the alleged seizure—although involving a much shorter period of seizure. *Id.* at 813. Courts nationwide have recognized that a defendant does not have a significant possessory interest in their phones while detained during the alleged unreasonable period of delay before obtaining a search warrant. *See United States v. Shaw*, 531 F. App'x 946,

29

949 (11th Cir. 2013) ("Shaw was in custody throughout the contested delay [from June 8, 2011, to September 7, 2011,] and concedes he could not have physically possessed the phones."); *United States v. Taylor*, No. 2:16-CR-300-RSL, 2019 WL 652369, at *3 (W.D. Wash. Feb. 15, 2019) ("Regardless, defendant had only a minimal possessory interest in the S6 at the time. He was in custody for the entire time between the seizure of the S6 on June 15, 2016 and the obtaining of the second search warrant on February 22, 2018."); *United States v. Brantley*, No. 1:17-CR-77-WSD, 2017 WL 5988833, at *2 (N.D. Ga. Dec. 4, 2017) ("Furthermore, Brantley, having been arrested and detained, was not deprived of access to and use of the seized cellular telephones, because he was in custody, and he does not contend he was allowed possession of a cell phone while detained.").

Additionally, Defendant would not be allowed to access his cell phone during this period, and the Court notes that Defendant did not request the return or transfer of his phone at any point. *See United States v. Johns*, 469 U.S. 478, 487 (1985) (finding an individual who did "not even allege [ ], much less prove[ ], that the delay in the search of packages adversely affected legitimate interests protected by the Fourth Amendment" and "never sought return of the property" failed to make a sufficient showing that the delay was unreasonable); *United States v. Stabile*, 633 F.3d 219, 235–36 (3d Cir. 2011) (noting that the defendant "did not ask for the return of his hard drives until . . . eighteen months after the initial seizure").

Next, Defendant asserts that the forty-two-day period of time between the seizure of his phone and law enforcement obtaining a search warrant was unreasonable. Defendant urges the Court to find that the search of his cell phone and all evidence seized therefore should be suppressed "based on persuasive authority from other Circuit Courts of Appeal [supporting that]

the investigators in this case waited too long to secure a warrant." [Doc. 48 at 3].

Defendant first cites to *United States v. Pratt*, where the Fourth Circuit found that law enforcement's thirty-one-day delay in obtaining a warrant after the seizure of the defendant's phone was unreasonable. 915 F.3d 266, 270–73 (4th Cir. 2019). In *Pratt*, the defendant was under investigation for running a prostitution ring that included juveniles, and when FBI agents confronted the defendant after setting up a "date" with an alleged underage female, law enforcement seized the defendant's phone after he refused to consent to a search. *Id.* at 269–270. The Fourth Circuit found that the defendant "didn't diminish his possessory interest in the phone," as "[h]e didn't consent to its seizure or voluntarily share the phone's contents." *Id.* at 245; *see also United States v. Lustig*, 830 F.3d 1075, 1085–86 (9th Cir. 2016).

However, unlike in the present case, the defendant in *Pratt* "was not incarcerated when his cell phone was seized and subsequently searched and was therefore able to claim a strong possessory interest in his cell phone." *See United States v. Dorsey*, No. CR RDB-18-0347, 2019 WL 3804113, at *5 (D. Md. Aug. 13, 2019); *see also United States v. Musquiz*, No. 4:18CR3116, 2019 WL 3084944, at *6 (D. Neb. June 27, 2019) ("Under the facts presented, Musquiz' possessory interest in the phone was essentially negated by his incarceration. Balancing Musquiz' interest with the government's interest in securing and obtaining evidence of criminal activity, I find the 29-day delay in seeking a warrant to search the digital data on Musquiz' phone was not unreasonable."), *report and recommendation adopted by*, 2019 WL 3082498 (D. Neb. July 15, 2019). Defendant further does not provide substantial support for his argument that the delay in obtaining a search warrant for his phone was unreasonable if law enforcement believed that it had probable cause to obtain such a warrant upon the initial seizure. *See Dorsey*, 2019 WL 3804113

31

at *5 ("Agent Filbert also admitted that he could have drafted an affidavit to support a search warrant application immediately after the FBI acquired the phone and that federal magistrate judges are available 24-hours per day throughout the week to evaluate search warrant applications. These facts, however, do not render the Government's delay 'unreasonable.'").

Moreover, in *Pratt*, "[t]he government's only explanation for the 31-day delay in obtaining a warrant was that Pratt committed crimes in both North Carolina and South Carolina and agents had to decide where to seek a warrant." 915 F.3d at 272. Here, Officer Williams testified that during the alleged unreasonable period of delay, he interviewed the victim and the victim's cousin, as well as Defendant's ex-girlfriend; prepared the search warrants for the Facebook accounts at issue, as well as for the cell tower information from Defendant's cell phone; reviewed the information received from the search warrants for Defendant's and the victim's Facebook accounts, including the voluminous amount of provided messages; presented to the grand jury and prepared the discovery to be given to Defendant; attended a mandatory three-day training program; and assisted in the execution of a search warrant for an unrelated case. *See United States v. Laist*, 702 F.3d 608, 614 (11th Cir. 2012) (noting that when balancing the interest at stake, the court "take[s] into account whether the police diligently pursue[d] their investigation") (citation and internal quotation marks omitted); *United States v. Vallimont*, 378 F. App'x 972, 975–76 (11th Cir. 2010) (upholding a forty-five-day delay in obtaining a search warrant for a seized computer where the investigator stated that he was required to work on other cases, the county's resources were overwhelmed, and the defendant had diminished his privacy interest by allowing another person access to the computer). Therefore, the Government finds that law enforcement proceeded diligently and provided an explanation for the delay in obtaining a search warrant.

32

Lastly, the Government had a "legitimate interest in holding the property as evidence" because law enforcement was investigating Defendant's enticement of a minor for illegal sexual activity—"unlawful conduct that the Government had a significant interest in investigating and preventing." *United States v. Brantley*, No. 1:17-CR-77-WSD, 2017 WL 5988833, at *2 (N.D. Ga. Dec. 4, 2017); *see, e.g.*, *United States v. Howe*, 545 F. App'x 64, 66 (2d Cir. 2013) (holding the government had a "strong interest in retaining the laptop and not returning it to Howe" because it contained evidence of child pornography); *United States v. Conley*, 342 F. Supp. 3d 247, 269 (D. Conn. 2018). The Court similarly notes the Government's argument that "[t]he complex nature of the investigation and the diligent efforts by law enforcement weigh against suppression in this case." [Doc. 49 at 6].

Accordingly, the Court finds that law enforcement's delay in obtaining a search warrant was not unreasonable in this case, and Defendant is not entitled to the suppression of evidence contained on his cell phone.

33

## V.    CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress Facebook Messages and Cell Phone Text Messages [Doc. 47] and Motion to Suppress Contents of Search of Defendant's Cellular Telephone [Doc. 48] be **DENIED**.[6]

Respectfully submitted,

*Bruce Guyton*

United States Magistrate Judge

---

[6] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

34